**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------x
**PATRICIA O'REILLY,**

              **Plaintiff,**                          **ORDER**
                                                        **01 CV 2537 (NG)(KAM)**

  - against -

**CONSOLIDATED EDISON COMPANY**
**OF NEW YORK, INC., and GAIL**
**WALTHER,**

              **Defendants.**
----------------------------------------------------------x

**GERSHON, United States District Judge:**

      Plaintiff Patricia O'Reilly brings this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; and the New York State Human Rights Law ("NYSHRL"), Executive Law §§ 296 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), Administrative Code of the City of New York § 8-107. Plaintiff claims that she was discriminated against by her employer on the basis of disability or perceived disability in violation of the ADA and New York state law; that she was retaliated against for taking leave protected by the FMLA; and that her termination constitutes interference with attainment of pension under ERISA.[1] The only disability discrimination claims against defendant Gail Walther, plaintiff's supervisor, are brought under New York law. Defendants Consolidated Edison Company of New York, Inc. ("ConEd") and Walther seek summary judgment on all of plaintiff's claims.

---

[1] Plaintiff has agreed to voluntarily withdraw her claims of age discrimination under the New York State Human Rights Law and the New York City Administrative Code. *See* Plaintiff's Opposition to Summary Judgment, n.1.

**BACKGROUND**

Unless otherwise indicated, the following facts are undisputed.

Plaintiff began her employment at defendant ConEd in approximately June 1971 as a management secretary. Over the years of her employment at ConEd, plaintiff received a number of promotions and changes in job title. Starting in about 1977, plaintiff worked in the personnel department, first as a personnel representative and then as a personnel administrator. In 1993, the personnel department was renamed the human resources department, and plaintiff's job title changed to Specialist. This remained her job title at the time of her termination. At some point, plaintiff changed to a specialist position in a support group that oversees the field departments and switched to a different office location in Queens. Plaintiff resided approximately three and one-half miles from the Queens office.

Plaintiff dealt with sick leave matters as part of her job in the personnel and human resources departments. Her duties included counseling managers on how to deal with employees with poor attendance records, verifying the amount of past leave taken by employees and any disciplinary action taken against them, and advising managers on setting up surveillance. Plaintiff was involved in two instances of surveillance of employees who claimed to be sick during her tenure at ConEd, one of whom was terminated following surveillance.

Plaintiff's main job duty as Specialist in the field departments' support group was to supervise unionized clerical employees, specifically, to monitor their work, deal with the manager, and ensure that the manager's goals were being met. As of 1999, plaintiff's job activities included speaking on the telephone; preparing and processing paperwork; filing; working on the computer, including e-mail and data entry; and driving between her main office in Queens and one or both of

2

the ConEd field offices located in Brooklyn to visit and supervise employees in those offices.

Plaintiff injured her right Achilles tendon on September 8, 1999 as she was on her way to work. That morning, in her driveway, plaintiff's ankle twisted and she heard a pop. Plaintiff proceeded to work that morning and worked a full day. Plaintiff proceeded from work to an appointment with Dr. Neil Blatt, a podiatrist, that afternoon. Plaintiff testified that Dr. Blatt gave her a brace to wear to keep her leg immobilized until she saw a surgeon. On September 9, 1999, plaintiff reported sick and went on sick leave. Plaintiff remained out on sick leave from September 9, 1999 until her termination on March 1, 2000, for a total of approximately 25 weeks of sick leave.

Pursuant to ConEd's sick leave policy, as a management employee plaintiff was entitled to one week of sick leave for every year worked, plus 20 weeks. Thus, plaintiff had available to her 29 weeks of sick leave based on her 29 years of service, plus an additional 20 weeks, for a total of 49 weeks of sick leave.

ConEd utilizes an in-house Occupational Health department to evaluate the medical condition of employees upon the request of their departments and to determine the conditions under which such employees can perform their duties. Employees who are absent in excess of five days as a result of illness or injury are required to submit periodic physician's reports, known as "medical lines," and/or to schedule appointments with Occupational Health for evaluation. Plaintiff had her first appointment with the Occupational Health department on October 19, 1999. At that time, plaintiff was approved for two months of sick leave. At follow-up appointments on December 17, 1999, January 10, 2000, and February 10, 2000, the doctors who saw plaintiff at Occupational Health each approved an additional month of sick leave for plaintiff. Thus, plaintiff was not scheduled to return to work until approximately March 11, 2000. At plaintiff's January 13, 2000

appointment at Occupational Health, Dr. Pordy observed that plaintiff was unable to extend fully her right foot. At her appointment on February 10, 2000, Dr. Nyack noted that plaintiff was wearing a brace, still had difficulty walking, and that her gait was somewhat unbalanced.

Dr. Sounder Eswar treated the injury to plaintiff's Achilles tendon. When he began treating plaintiff, Dr. Eswar asked her what her job duties entailed. Dr. Eswar testified that plaintiff told him her job involved walking to "check on things" and that it was not purely desk work. Plaintiff underwent surgery on her ankle on September 21, 1999. After the surgery, plaintiff had a hard cast on her leg below the knee until the last week of October 1999, after which she used a soft cast consisting of cotton padding and an Ace bandage. Plaintiff testified that she alternated between crutches and a wheel chair after her surgery until the end of November, when Dr. Eswar allowed her to walk. Plaintiff began physical therapy at the end of November as well. Plaintiff testified that she reinjured her ankle on December 4, 1999 while walking her dog, which required her to stop the physical therapy. At this point, plaintiff was able to drive.

The medical "lines" that plaintiff submitted to ConEd's Occupational Health Department from Dr. Eswar from October 1999 through February 2000 indicated that plaintiff was unable to work. Dr. Eswar based this conclusion on plaintiff's representation to him that her job involved walking. As of January 6, 2000, Dr. Eswar believed that plaintiff could take care of her personal needs, such as bathing and dressing, but could not drive or walk. Plaintiff did not report to Dr. Eswar that, as of January 2000, she was walking, driving, and spending significant amounts of time outside of her home.

Plaintiff testified that Dr. Eswar gave her a brace and told her to use it whenever she felt that her leg was weak and needed extra support. In an affidavit submitted in opposition to defendants'

4

motion for summary judgment, plaintiff indicates that Dr. Eswar also gave her a blue latex flexible support device that could be worn under her pant leg. In addition, Dr. Eswar prescribed Coumadin, a blood thinner, and water pills to assist with any swelling to plaintiff's leg associated with phlebitis.

Plaintiff's supervisor, defendant Walther, reported seeing plaintiff out driving on Long Island while plaintiff was out on sick leave. Ms. Walther testified that, at approximately 7:00 or 8:00 p.m. on the Sunday after plaintiff's December medical appointment at Occupational Health, she was out observing Christmas lights on houses in a community on Long Island. Ms. Walther testified that she was walking with some friends when she saw plaintiff sitting in the driver's seat of a parked car from approximately 20 feet away. Ms. Walther testified that she observed plaintiff sitting in the car for a few minutes, after which the car pulled away. Plaintiff disputes that she was on Long Island on the evening of December 19, 1999, and cites EZ Pass records which indicate that a car registered to her family traveled over the George Washington Bridge from New Jersey into New York at 9:22 that evening and over the Throgs Neck Bridge into the Bronx at 9:36. However, when asked at her deposition whether she went to Long Island at any time over the Christmas holidays, plaintiff testified, "I could have. I don't remember." Plaintiff does not dispute that she was able to drive during this period.

Ms. Walther reported the incident to Nancy Forte, her supervisor, and requested surveillance of plaintiff. ConEd utilizes surveillance as part of its Lost Time Control Unit, a task force established within the Human Resources Department to reduce the amount of time lost to sick leave and other excused time. Ms. Walther testified that she requested surveillance because she believed that, if plaintiff could drive, she could come to work, since plaintiff has an office job. John Mucci, the General Manager of plaintiff's organization, authorized surveillance of plaintiff, which was

5

conducted by Phoenix Research Corporation on January 21 and 22, 2000 and February 10, 2000.

The surveillance tapes taken on the afternoon of January 22, 2000 show plaintiff walking towards the entrance of an off-track wagering location in Pennsylvania, where she remained for a few hours. Plaintiff admits that she spent approximately two or three hours inside an off track wagering establishment in the township of Lehigh Valley, Pennsylvania on or about that date. Plaintiff has a house in Pennsylvania where she was staying at that time. The surveillance tape taken on February 10, 2000 shows her exiting her residence in Queens, driving for approximately one hour to her appointment at Occupational Health, and entering the ConEd building wearing a visible brace on the outside of her pant leg. The tape taken on February 10, 2000 also shows plaintiff exiting ConEd, walking approximately two blocks to a Food Emporium store, and then exiting the store with two plastic shopping bags, returning to her car, and driving home, where she exited her car and climbed the stairs to her front door without any visible brace on the outside of her pant leg.

Dr. Lynne Hildebrand, a physician in the Occupational Health Department at ConEd, was asked to review the surveillance tapes and plaintiff's medical records to determine if plaintiff could do some work at ConEd. Based on her review of the tapes and the medical records, Dr. Hildebrand concluded that plaintiff's actions on the videotapes were inconsistent with her representations to Occupational Health. Specifically, Dr. Hildebrand concluded that the range of motion in plaintiff's right ankle and foot could not be as limited as she had represented, based on her observations of plaintiff on the videotapes. Dr. Hildebrand noted that plaintiff's activity level on the video tapes–*i.e.*, walking without a brace, running errands, driving, and spending several hours outside of the home–was commensurate with, or greater than, the activity level required by her job, which consisted of administrative and sedentary duties performed at her desk and some driving.

6

Dr. Hildebrand reported her conclusions to her supervisor, Dr. Dara Richardson; Joe Basile, the human resources specialist who oversaw surveillance activities at ConEd; and Nancy Forte, a Senior Specialist in the Human Resources Department. The conclusion was also communicated to plaintiff's department. After receiving the information, Walther, Walther's supervisor John Mucci, and Richard Crowie, then-Vice President of Human Resources, consulted with one another and determined that plaintiff would be terminated.

Plaintiff was called to a meeting at ConEd on March 1, 2000, with defendant Walther and Nancy Forte. At the meeting plaintiff was informed that she was terminated effective immediately. The "Employee Interview Form" prepared after the meeting states that plaintiff was informed that "it was determined that her absenteeism ... was inconsistent with the employee's medical condition," and that she had "misrepresented the severity of her illness" and "collected sick pay under false pretenses."

Plaintiff appealed her termination. Loretta Vanacore, Director of the Learning Center, a training center at ConEd, was assigned to review plaintiff's termination on the appeal. Her understanding of her role was that she was to make an independent judgment as to whether there was cause for the termination. After reviewing the records and videotapes and interviewing the people associated with the case, Vanacore concluded that the termination was appropriate. Vanacore concluded that the medical "lines" were not consistent with what was shown on the videotapes and that, based on the activities shown in the videotapes, plaintiff could have come back to work. Based on Vanacore's recommendation and his own review of the case, Richard Cowie, the Vice President of Human Resources, denied plaintiff's appeal.

Prior to her termination, no one at ConEd discussed with plaintiff any concerns about

plaintiff's use of sick time or any inconsistencies regarding her medical condition and no one requested that she return to work. It is undisputed that plaintiff had no record of disciplinary action or significant absenteeism during her almost thirty years as an employee of ConEd prior to her termination.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir. 1995). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citation omitted).

In employment discrimination actions, courts are particularly cautious about granting summary judgment where intent is at issue. This is because "a victim ... [is] seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (citation omitted). Consequently, "where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily not appropriate." *Id.* However, "the summary judgment rule would be rendered sterile

8

... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985). Therefore, in the discrimination context, a plaintiff "must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

All of plaintiff's claims are subject to the burden shifting analysis developed by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Heyman v. Queens Village Comm. For Mental Health*, 1998 F.3d 68, 72 (2d Cir. 1999) (ADA claim); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000) (state law disability discrimination claims); *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (FMLA claim); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112-13 (2d Cir. 1988) (ERISA claim). There is no dispute that ConEd is an employer subject to these statutes.

**Disability Discrimination Claims**

a. ADA Claim

In order to establish a *prima facie* case of discrimination under the ADA, plaintiff must show (1) that she is an individual with a disability within the meaning of the ADA; (2) that she is otherwise qualified for the position, with or without reasonable accommodation; and (3) that she suffered an adverse employment action because of her disability. Once plaintiff has established her *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Once defendant has done so, the burden shifts back to plaintiff to show that the proffered reason is merely a pretext. Here, defendant

argues both that plaintiff has failed to make out a *prima facie* case of disability-based discrimination and that plaintiff has failed to show that its proffered reason for terminating her, namely, that she was taking sick leave under false pretenses, is a pretext.

In order to prevail on her disability discrimination claim, plaintiff must, as a threshold matter, show that her medical condition qualifies as a disability under the ADA. "Disability" under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Plaintiff claims that the injury to her Achilles tendon combined with the phlebitis developed secondarily to the injury constitutes a physical impairment which substantially limits major life activities, or, as an alternative, claims that defendants regarded her as having such an impairment. The major life activity she identifies as substantially limited is walking. Construing the evidence liberally to effectuate the remedial purposes of the ADA, plaintiff has failed to establish a *prima facie* case of disability discrimination because her temporary impairment does not qualify as a disability within the meaning of the ADA.

In determining whether an impairment is "substantially limiting," the court can consider "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630(j)(2); *see also Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998). Temporary impairments generally are not considered substantially limiting. *See Colwell*, 158 F.3d at 645-46; *Fagan v. United Int'l Ins. Co.*, 128 F.Supp.2d 182, 185 (S.D.N.Y. 2001); *see also* 29 C.F.R. Pt. 1630 App., § 1630(j) (noting that

10

"temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities" and listing as illustrative examples of such impairments broken limbs and sprained joints). Plaintiff claims that her injury prevented her from working from September 9, 1999 until sometime in March or April of 2000, a period of approximately six or seven months. Plaintiff underwent surgery and physical therapy to address her injury. Even accepting her claim, there is no indication in the record that the injury was expected to permanently incapacitate plaintiff or that defendant perceived that it would. Thus, no reasonable jury could conclude that plaintiff had a disability under the ADA, and defendants are entitled to judgment as a matter of law on plaintiff's ADA claim.

Furthermore, plaintiff acknowledged in her deposition that, as of January 2000, she was able to drive, walk short distances, climb stairs, sit with her foot elevated, and groom and bathe herself. Although plaintiff reinjured her Achilles tendon in early December 1999, she acknowledges that the video surveillance tapes, taken in January and February 2000, show her driving, walking without an external brace, climbing stairs, carrying groceries, and spending several hours in a gaming establishment in Pennsylvania. The court's review of the surveillance tapes confirms that the January 22, 2000 tape shows plaintiff walking with no limp over snow while wearing no visible brace, and, after several hours inside an off-track betting establishment, walking back to her car and easily getting into it. The tape taken on February 10, 2000 shows plaintiff entering ConEd wearing her leg brace, then returning home without the brace and climbing stairs to her front door while carrying two shopping bags, and bending over to pet her dog.

Plaintiff also does not dispute that she took two four-day trips to Las Vegas while she was out on sick leave, one in October 1999 and one in February 2000. Thus, based on this undisputed

evidence, no reasonable jury could conclude that plaintiff's injury substantially limited one or more major life activities, and plaintiff has failed to demonstrate that she had a disability.

In addition, even if plaintiff had demonstrated a genuine issue of material fact as to whether she could be considered disabled within the meaning of the ADA, plaintiff still has the burden of showing that the actual reason for her termination was discrimination, and she has failed to meet this burden. Defendants assert that ConEd's actual reason for terminating plaintiff was that she misused the sick leave policy and misrepresented the extent of her limitations. In order to rebut this asserted legitimate, non-discriminatory reason for the termination, plaintiff must provide proof, not only that the proffered explanation was false, but that unlawful discrimination was the true motivation behind her termination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993). Plaintiff argues that defendants' proffered reason is too vague to constitute a legitimate nondiscriminatory basis for her termination because they have not articulated exactly what constituted the "false pretenses" under which plaintiff was purportedly collecting sick leave and because Dr. Hildebrand never explained what on the surveillance tapes was "inconsistent" with plaintiff's medical presentation.

However, the record establishes that ConEd concluded that the extent of plaintiff's physical limitations, as shown on the surveillance tapes, did not justify plaintiff's continued absence from work on sick leave. Dr. Hildebrand determined, based on the activities she observed plaintiff engaged in on the video tapes, that plaintiff could engage in desk work at ConEd. She also noted that the observed activities required a greater range of motion in plaintiff's foot and ankle than plaintiff had represented to Occupational Health that she possessed. There is nothing vague or unclear about defendant's proffered reason for terminating plaintiff and plaintiff has failed to overcome it.

The participation of ConEd's Lost Time Control Unit in the decision to terminate plaintiff does not indicate, as plaintiff argues, that the proffered basis for her termination was pretextual. Plaintiff has offered no evidence that the Lost Time Control Unit's actions in her case were motivated by any discriminatory animus. Rather, the existence of the Lost Time Control Unit indicates that ConEd had a program in place for controlling the misuse of sick leave. Thus, if anything, that the Unit was involved in plaintiff's case lends support to ConEd's stated reason for terminating her, *i.e.*, that it concluded she was misusing sick leave.

Plaintiff also alleges that she was discriminated against on the basis of a perceived disability. Whether plaintiff is "'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" *Colwell*, 158 F.3d at 646 (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997)). There is no evidence in the record to support the conclusion that ConEd terminated plaintiff because it regarded her as having a disability. Indeed, the record demonstrates that defendant terminated plaintiff because it concluded that plaintiff was not sufficiently impaired to collect sick leave and had misrepresented her condition. Moreover, although defendant approved sick leave for plaintiff based on the injury to her Achilles tendon and her representations to her doctors, this does not constitute evidence that they perceived plaintiff as being disabled within the meaning of the ADA, since, as explained above, a temporary impairment does not constitute a "disability" for ADA purposes.

### b. State Law Disability Discrimination Claims

Having dismissed plaintiff's federal disability claims, and, as will be seen below, the

remainder of plaintiff's federal claims, this court declines to exercise supplemental jurisdiction over her related state law claims. *Giordano v. City of New York*, 274 F.3d 740, 754-55 (2d Cir. 2001) ("[T]he appropriate analytic framework to be applied in discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York."). Plaintiff's NYSHRL and NYCHRL claims are therefore dismissed without prejudice.

**FMLA Claim**

Plaintiff claims that she was terminated in retaliation for taking leave protected by the FMLA. Under the FMLA, plaintiff was entitled to take up to twelve weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Section 2615(a)(1) of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). In order to make out a *prima facie* case of retaliation under the FMLA, plaintiff must show that (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Here, plaintiff meets the first three requirements of the *prima facie* case. Plaintiff used all twelve weeks of her FMLA-protected leave, which ran from September 9, 1999 to approximately December 1, 1999. (Under ConEd's sick leave policy, any sick leave utilized by an employee is first credited against the twelve-week allotment of leave protected under the FMLA.) Defendants

14

maintain that there is no evidence in the record that plaintiff's termination occurred under circumstances giving rise to an inference of retaliatory intent and that, even if plaintiff has established a *prima facie* case, she has failed to show that ConEd's stated reason for terminating her is a pretext.

Plaintiff points to the following circumstances as giving rise to an inference of retaliatory intent: (1) plaintiff was terminated while out on sick leave for the same serious medical condition she had while covered by FMLA leave; (2) her termination occurred only a few months after the FMLA time was utilized based on surveillance that was initiated by Walther a few weeks after the expiration of plaintiff's FMLA leave; (3) the stated reason for plaintiff's termination directly related to her use of sick time for medical leave; and (4) defendant Walther, who participated in the decision to terminate plaintiff, was aware that at least a portion of plaintiff's sick leave was covered by FMLA.

Assuming she can meet the burden of a *prima facie* case, plaintiff cannot establish a causal connection between the exercise of FMLA-protected rights and her termination. ConEd's sick leave policy required plaintiff to return to work as soon as she could perform her job functions. ConEd terminated plaintiff only after it concluded that she misrepresented her condition to its doctors and continued to collect sick leave when she could have returned to work, in violation of its policy. As noted above, plaintiff has failed to demonstrate that this proffered basis for her termination is a pretext. ConEd's efforts to curtail abuse of its sick leave policy, a policy that is far more generous than that established by the FMLA, do not constitute retaliation under the FMLA. *See Worster v. Carlson Wagon Lit Travel, Inc.*, 353 F.Supp.2d 257, 268, 272-73 (D. Conn. 2005) (termination of employee for taking second job while out on FMLA leave, in violation of employer's leave policy,

did not violate the FMLA); *see also Chavez v. Thomas and Betts Corp.*, 396 F.3d 1088, 1104-05 (10th Cir. 2005) (no violation of the FMLA where employee was fired for violating employer's "no show" policy and failing to submit FMLA leave request within required period).

While plaintiff speculates that defendant Walther lied about seeing her on Long Island in December 1999, there is no evidence that plaintiff was treated differently from any similarly situated employee. If Walther was mistaken, or even if she lied, plaintiff acknowledges that she was driving during this period. The surveillance tapes taken at Walther's request were reviewed by personnel in ConEd's Occupational Health department. Plaintiff has offered no evidence that Walther's actions were based on a retaliatory motive. In sum, none of the circumstances to which plaintiff points are sufficient to persuade a reasonable trier of fact that the defendants' stated reasons for the termination were a mere pretext for retaliation.

**ERISA Claim**

Finally, plaintiff claims that her termination interfered with her attainment of rights under her pension plain, in violation of ERISA. Section 510 of ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. To prevail on a claim under Section 510, plaintiff must show that her employer was at least in part motivated by the specific intent to engage in activity prohibited by the statute. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988). However, "no ERISA cause of action lies where the loss of pension benefits was a mere

16

consequence of, but not a motivating factor behind, a termination of employment." *Id.* (quoting *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y. 1982)). As noted above, the *McDonnell-Douglas* burden shifting analysis applies to Section 510 cases. *See id.*, 859 F.2d at 1112-13.

Plaintiff was 47 years old at the time of her termination. Had plaintiff remained employed at ConEd until the age of 55, her pension benefits would have increased significantly. As evidence of circumstances giving rise to an inference of discrimination, plaintiff points to the following: (1) plaintiff was scheduled to receive a salary increase in approximately July 2000, less than five months after her termination, which would have resulted in an increase in her eventual pension benefit; (2) Walther, who initiated surveillance of plaintiff and participated in the decision to terminate her, was aware that employees receive better pension benefits the longer they are employed; (3) ConEd's upper management failed to make any attempt to ascertain plaintiff's medical status following surveillance, even though plaintiff had a "pristine" employment record of almost thirty years.

Based on the record, no reasonable jury could conclude that ConEd was motivated by a desire to interfere with plaintiff's ERISA-protected pension benefits. Plaintiff was eight years away from her 55th birthday at the time of her termination. As noted above, plaintiff has not demonstrated that ConEd's proffered reason for her termination is a pretext. Thus, she has failed to raise a genuine issue of material fact as to whether ConEd was at least in part motivated by the specific intent to engage in prohibited activity, and defendants are entitled to summary judgment on this claim.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted as to all of plaintiff's claims under federal law. The Clerk of Court is directed to enter judgment for the defendants on all of plaintiff's federal claims. Plaintiff's state law claims under NYSHRL and NYCHRL are dismissed without prejudice.

**SO ORDERED.**

*/s/ Nina Gershon*
**NINA GERSHON**
**United States District Judge**

**Dated: June 24, 2005**
   **Brooklyn, New York**